EXHIBIT 1

26CV018591-910

| | |
|---|---|
| NC STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION |
| COUNTY OF WAKE | CASE NO. |

| | |
|---|---|
| CDM Smith Inc., | |
| Plaintiff, | |
| vs. | **VERIFIED COMPLAINT** |
| Reed Barton | *JURY TRIAL DEMANDED* |
| Defendant. | |

Plaintiff CDM Smith Inc. ("CDM Smith"), by and through its undersigned counsel, files this Verified Complaint against Defendant Reed Barton ("Barton"), and states as follows:

## NATURE OF THE CASE

1. This is an action based upon: (1) Breach of two Contracts; (2) Breach of Good Faith and Fair Dealing; (3) Computer Trespass in violation of N.C. Gen. Stat. §§ 14-458 ); (4) The Defend Trade Secrets Act (18 U.S.C. § 1836 et seq.); (5) the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152 et seq.; (6) the North Carolina Unfair and Deceptive Trade Practices Act. § 75-1, et seq., and (7) Conversion.

2. CDM Smith is an industry leader in engineering and construction, servicing public and private clients in the water, environmental, transportation, energy, and facilities projects industries. Among other service and product offerings, CDM Smith offers design, consulting and project management. Stated differently, CDM Smith provides engineering and construction solutions for delivery primarily in infrastructure. It was founded in 1947.

3. CDM Smith has invested more than 79 years, and millions of dollars, developing confidential and proprietary information, including trade secrets, that give it an advantage over its competitors in the marketplace, including, but not limited to, internal templates and tools for

EXHIBIT 1

pricing and budgeting projects. CDM Smith takes extensive measures to keep this confidential and proprietary information secret and out of the hands of those not authorized to have it (including its former employees).

4. CDM Smith maintains digital files, including those containing confidential and proprietary information and trade secrets, on company cloud servers that restrict access ("Company Servers").

5. Barton is a former Senior Client Service Leader, which is a client-facing employee of CDM Smith. As a Senior Client Service Leader, Barton led the sales process from start to finish, including, but not limited to, engaging and establishing new client relationships as well as maintaining existing client relationships, ensuring alignment between project results and contracted project work, monitoring revenue and profitability, and managing and collaborating with other CDM Smith employees on the delivery of contracted work to CDM Smith's clients.

6. Because of his significant contributions to CDM Smith, Barton was also a participant in CDM Smith's employee-owned model, and held a significant ownership stake in the company.

7. Barton resigned from CDM Smith accepting employment with a direct competitor, Garver USA[1] ("Garver"), in a similar position as he held at CDM Smith.

8. On information and belief, Garver is an engineering, planning, and environmental services firm focused on aviation, transportation, buildings, federal, water and wastewater services.

9. On information and belief, Garver has not had a significant presence in the industry in North Carolina, but is attempting to leverage its hire of Barton to gain a foothold in the market.

---

[1] Garver-USA, Inc., Garver, Inc., Garver, PLLC, and/or any of their related or affiliated entities.

EXHIBIT 1

10.     The day after CDM Smith accepted Barton's resignation, Barton was required to return his CDM Smith-issued computer (the "Company Computer").

11.     CDM Smith forensically examined the Company Server and discovered that, over the course of approximately three days surrounding Barton's submission of his resignation notice on April 28, 2026, Barton covertly downloaded, copied, or otherwise transferred *tens of thousands* of files from the Company Server and/or his Company Computer to an external hard drive or storge device.

12.     Based on CDM Smith's analysis to date, these files broadly fall within categories including, but not limited to: technical client project files, internal templates and project management resources, contracts, proposals, pricing information, financial audit and tracking data, and documents related to CDM Smith personnel, including employee resumes and portfolios of work as well as documents containing CDM Smith employee compensation data.

13.     Barton's conduct as described in the foregoing paragraphs was not authorized by CDM Smith, and, in fact, directly violated CDM Smith company policies and two nondisclosure agreements to which Barton is a party.

14.     Following his voluntary resignation, CDM Smith reminded Barton by orally informing him during his offboarding meeting, and later in writing, of his legal and contractual obligations owed to CDM Smith.  CDM Smith also informed Garver of Barton's obligations owed to CDM Smith, particularly with respect to CDM Smith's confidential information and trade secrets.  Additionally, in its May 6, 2026 letter to Barton, CDM Smith demanded that he immediately return the external storage drive containing its confidential information and trade secrets as well as all its property in his possession by May 8, 2026. (*See* Exhibit A, CDM Smith

3

EXHIBIT 1

letter to Barton; *see also* Exhibit B, CDM Smith letter to Garver.) Barton was also asked to confirm via a signed acknowledgement that he had returned all physical documents and files in his possession containing CDM Smith property, to identify and disclose any email accounts and cloud-based storage accounts (including, without limitation, any personal OneDrive, Google Drive, iCloud, Dropbox, or similar accounts) to or from which he uploaded, downloaded, transmitted, or forwarded CDM Smith property, or that otherwise contain, retain, or back up CDM Smith property and to identify and to disclose all other computers, devices, and/or accounts on which he uploaded, downloaded, transmitted, or stored CDM Smith property, or that otherwise contain, retain, or back up CDM Smith property. (*See* Ex. A.)

15. Barton failed to return the external storage device by May 8, 2026.

16. Although Barton later returned an external hard drive on May 12, 2026, CDM Smith is currently in the process of having a third-party forensic analysis performed to, among other things, verify the contents of the external hard drive. While an external hard drive was delivered, Barton failed to sign an acknowledgement confirming that he had returned all physical documents and files in his possession containing CDM Smith property. Additionally, Barton has failed to identify and disclose any email accounts and cloud-based storage accounts (including, without limitation, any personal OneDrive, Google Drive, iCloud, Dropbox, or similar accounts) to or from which he uploaded, downloaded, transmitted, or forwarded CDM Smith property, or that otherwise contain, retain, or back up CDM Smith property and to identify and to disclose all other computers, devices, and/or accounts on which he uploaded, downloaded, transmitted, or stored CDM Smith property, or that otherwise contain, retain, or back up CDM Smith property. Consequently, CDM Smith is concerned, upon information and belief, that Barton possesses its confidential information and trade secrets. Specifically, to date, Barton has refused to sign a

EXHIBIT 1

declaration affirmatively stating that he has returned all of CDM Smith's property, including its confidential information and trade secrets, despite several written requests that he do so.

## PARTIES

17. CDM Smith is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business in Massachusetts.

18. CDM Smith maintains an office in Raleigh, North Carolina, and regularly conducts business in the State of North Carolina.

19. Barton began working for CDM Smith in its Raleigh, NC office on or about June 17, 2013, until on or about May 6, 2026, after he voluntarily resigned his employment.

20. Upon information and belief, Barton is a resident of Holly Springs, Wake County, North Carolina.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to N.C. Gen. Stat. § 1-75.4(1), (3), (4), and (5).

22. Venue is proper in this Court pursuant to N.C. Gen. Stat. § 1-82.

23. The amount in controversy exceeds the jurisdictional amount of $25,000 needed to file suit in the Superior Court Division.

## FACTUAL ALLEGATIONS

***CDM Smith and its Business***

24. CDM Smith provides engineering and construction services, from design and project management to consulting. In its 79-year history, it has delivered more than 150,000 projects, spanning over 20,000 individual clients in more than 150 countries. It delivers its services

5

EXHIBIT 1

on international developmental projects, to federal, state, and local governments, as well as clients in the private sector.  It employs approximately 7,000 individuals globally.

### CDM Smith's Confidential and Trade Secret Information

25.     CDM Smith has invested significant resources in developing its products and services.  It has spent nearly 80 years, millions of dollars, and formed teams of marketing, operations, engineering, and sales personnel to develop trade secret and confidential information regarding CDM Smith's proposal process, project details, customer preferences, customer contracts, pricing and pricing strategies, internal templates and project management resources, financial audit and tracking spreadsheets, and other competitively valuable information. (*See* Exhibit C, Declaration of James Livermore in Support of Verified Complaint ("Livermore Decl."), ¶ 5.)

26.     CDM Smith derives significant advantage from this confidential and trade secret information.  The compilation of such data allows CDM Smith to respond more quickly and effectively to requests for proposals, anticipate the needs of its current and potential customers, understand the current capabilities and likely future needs of clients, predict and prepare for emerging market trends, develop project approaches, submit competitive price structures, efficiently time and target its marketing efforts, prepare actionable product development plans and budgets, and quickly develop industry-leading engineering solutions  for customers and potential customers.  In short, the information at issue in this matter is critical to CDM Smith's ability to successfully compete in the marketplace.  A competitor's or other third party's use of these confidential information and trade secrets would result in irreparable harm to CDM Smith by, for example, exposing its core business strategies, project approaches, historical project documents, and pricing strategies.  CDM Smith's competitors could use this information to compete with CDM

EXHIBIT 1

Smith for business without having to invest the time, effort, and resources that CDM Smith poured into developing this information. The disclosure of such material would not only destroy the technological and sales advantages that CDM Smith has devoted such significant resources to building, but could also severely damage CDM Smith's relationships with the affected customers by causing loss of customer loyalty and relationships. Furthermore, customers could bring legal action against CDM Smith for breaches of confidential information, which in turn could lead to monetary damages, defense costs, and reputational damage due to loss of customer trust.

### *CDM Smith's Efforts to Protect its Confidential and Trade Secret Information*

27.     CDM Smith takes the protection of its confidential and trade secret information very seriously and expends a considerable amount of time and money to keep its information secure and develop technical security protocols. At all relevant times, CDM Smith has taken extensive and reasonable steps to protect the confidentiality of its trade secrets and other proprietary information. These steps include, but are not limited to:

a.     Data storage site security: the sites where data is stored, including data centers, offices, and off-site storage facilities, have appropriate physical security controls.

b.     Network security: the networks on which data is transmitted are protected from unauthorized access or infiltration, either internally or externally. The measures taken to ensure this include:

   i.     Running periodic external and internal vulnerability scanning;

   ii.     Maintaining perimeter defenses such as firewalls, intrusion prevention/detection systems, and monitoring activity logs;

   iii.     Maintaining an endpoint detection and response tool which monitors endpoints for behaviors and trends;

   iv.     Maintaining internal defenses such as security information event management to analyze log files to identify anomalous behavior and other threats, and;

EXHIBIT 1

v.     Utilizing a 24/7 security operation center to monitor security operations.

c.     Platform security: the technology on which data is stored, including servers, workstations and laptops, cloud service and other portable media, are protected from known threats by:

i.     Ensuring anti-virus or anti-malware systems are implemented and kept current for all operating systems;

ii.     Ensuring operating systems have secure configurations;

iii.     Ensuring security patches for both applications and operating systems are applied in a timely period, including encrypting laptop hard drives and portable media;

iv.     Ensuring risk assessments are performed on cloud networks, using industry accepted methodologies such as Cloud Security Alliance or equivalent, and;

v.     Ensuring mobile device management software is used to administer security controls on corporate supplied and personal devices.

d.     Data confidentiality: confidentiality of data is maintained by processes and procedures which include:

i.     The use of industry accepted strong encryption and pseudonymization;

ii.     The secure disposal of paper, equipment, media and data, and;

iii.     The security of data in transmission by means of encryption.

e.     Data access: data will be accessed only by the authorized personnel through such means as:

i.     The use of unique usernames and passwords to access the IT systems;

ii.     Use of multi-factor authentication to access IT systems remotely;

iii.     Implementing security policies, and providing regular training on the same, to ensure that passwords are not shared and that systems' passwords are changed periodically in-line with recommended best practice;

iv.     Ensuring access to data is authorized and approved, specifically by storing client and project specific data in a manner that allows for the person overseeing that client relationship and/or project to restrict access – i.e.,

8

EXHIBIT 1

those individuals who are working on projects are granted access to documents related to various projects;

v. Requiring permission to be requested, and granted, before any company employee is permitted to transfer any document from a CDM Smith server to an external drive, and, even where such permission is granted, requiring encryption on such external drive;

vi. Ensuring there is a clear segregation of duties between users;

vii. Ensuring access is granted on at least a privileged basis, and;

viii. Terminating access where and when appropriate.

f. Data processing: CDM Smith ensures that appropriate aspects of good security practice are enforced when processing any data.  These processes include:

i. Maintaining and enforcing policies on the secure handling and care of data and taking steps to ensure that such policies are known to all employees through awareness training, and;

ii. Providing secure coding techniques at the department level.

g. Staff and Third-Party Security Procedures: CDM Smith ensures and maintains the integrity of personnel accessing the data by:

i. Performing background checks on potential employees who will have access to personal data;

ii. Maintaining and enforcing policies on the secure handling and care of data, and taking steps to ensure that such policies are known to all employees;

iii. During the onboarding of certain employees who, based on the positions to which they are being hired, will have access to confidential information (including, as pertinent here, Barton), requiring such employees to execute agreements containing confidentiality provisions, or otherwise be under an obligation of confidentiality, prior to accessing data;

iv. For each log in by a CDM Smith employee onto a company-issued device, the employee is prompted to review a "splash" page containing a reminder that the employee is accessing the company's information systems and that those systems are being provided for authorized use only, and stating that, by clicking "OK", the employee consents to certain conditions, including that s/he will not make unauthorized use of the information systems and that s/he agrees to abide by applicable information security policies. The employee must click "OK" to complete the log in process;

EXHIBIT 1

v.    Reminding departing employees of their obligations to CDM Smith vis-à-vis confidential information and trade secrets, and;

vi.   In the case of Barton specifically: (1) requiring Barton to execute the Employee Confidentiality, Invention and Writing Agreement on or about June 20, 2013, during his onboarding (the "Confidentiality Agreement"); (2) entering into the Non-Solicitation and Non-Disclosure Agreement (the "Non-Disclosure Agreement") associated with an internal talent recruiting and promotion program entitled Inspire Leadership Academy on or about July 24, 2020, and; (3) during Barton's offboarding, reminding Barton of his obligations arising under the Confidentiality Agreement and the Non-Disclosure Agreement.

(*See* Livermore Decl., ¶ 6.)

### *Barton's Employment with CDM Smith and Voluntarily Resignation*

28.    Barton was a long-tenured and highly compensated CDM Smith employee.

29.    He began his employment with CDM Smith in or around June 2013, initially as an Environmental Engineer 5. In his role as an Environmental Engineer 5, Barton provided engineering support to clients and projects.

30.    Consistent with CDM Smith's standard practices, as a condition of his hire and employment with CDM Smith, Barton was required to enter the Confidentiality Agreement, which he executed on or about June 20, 2013. (*See* Exhibit D, Confidentiality Agreement.)

31.    In the Confidentiality Agreement, Barton agreed that he will not, during or subsequent to his employment with CDM Smith, without specific and written authorization of CDM Smith, disclose to anyone outside of CDM Smith, or use in any manner other than in the performance of CDM Smith's business, any confidential information or confidential material, which is defined to include "all financial information, internally prepared spreadsheets, financial models and analyses, drawings, designs, studies and reports as well as any internally developed computer programs, any document marked 'confidential' and any information described as confidential in any employee manual[,]" all "commercially valuable information whether or not

EXHIBIT 1

marked 'confidential' and without regard to its status in the official security classifications of the U.S. Government[,]", and CDM Smith "research and development plans and activities; the prices, terms and conditions of CDM Smith contracts; the identities, needs and requirements of CDM Smith clients; CDM Smith business plans and strategies; CDM Smith marketing plans and strategies; personnel information; financial information regarding CDM Smith, and; any information belonging to CDM Smith." (*See id.*, §§ Confidentiality Clauses, (a)(1)-(3).)

32.     In the Confidentiality Agreement, Barton further agreed that all inventions, ideas, writings or other discoveries he may invent, discover, conceive, etc., during his employment with CDM Smith, whether alone or with others, are the exclusive property of CDM Smith. (*See id.*, § Invention and Writing Clauses, (a).)

33.     The Confidentiality Agreement is governed by Massachusetts law. (See id., § Controlling Law.)

34.     Throughout his employment CDM Smith, Barton progressed his technical career as an engineer. He was hired as an Environmental Engineer 5 in June 2013. In or around March 2016, Barton was promoted to Environmental Engineer 6. In or around March 2018, Barton was promoted again, to Environmental Engineer 7. In or around March 2021, Barton was promoted again, to Environmental Engineer 8, the job he held until his voluntary resignation on or around May 6, 2026. With each level progression, Barton received an increase in compensation. Further, with each level progression, Barton's job duties changed. Although he continually provided engineering services, each level advancement allowed him to work on more technical projects, or handle more complex technical aspects of projects, and provided mentoring to more junior engineers within the company.

35.     In addition to his technical position, as an environmental engineer, Barton had the

11

EXHIBIT 1

opportunity to select and pursue a career path, such as project management or a client service leader. To that end, beginning in or around August 2013, in addition to his role as Environmental Engineer 5, Barton fulfilled the duties of a Project Manager 1 (later called a Project Manager). As a Project Manager, Barton was involved in the workflow of particular client projects, in addition to his engineering responsibilities and team client facing sales responsibilities to build, maintain and manage strong client relationships. Further, as a Project Manager, Barton had access to all pricing components of an assigned project, including actual staff rates and pricing strategies.

36.     In June 2017, Barton became a Senior Project Manager, again while still maintaining his engineering responsibilities. This role granted him eligibility in the Superior Performance and Recognition ("SPARS") Program, making him bonus eligible.

37.     In December 2017, Barton elected to pursue a client service leader career path – i.e., he wanted to be responsible for the sales and origination aspect of CDM Smith's business. From in or around December 2017 until in or around September 2020, in addition to his Environmental Engineer role, Barton fulfilled the duties of a Client Service Leader. As a Client Service Leader, Barton was responsible for identifying and pursuing leads, generating new client relationships, development and origination of new business, and maintaining and expanding existing client relationships. Barton was trained in implementing marketing strategies and was identified by CDM Smith as a transformational growth strategy leader for per- and polyfluoroalkyl substances ("PFAS") (i.e. a large group of synthetic "forever chemicals" that have been found to accumulate in the environment). Barton was also responsible for client business planning, including "Strengths, Weaknesses, Opportunities and Threats" ("SWOT") analysis.

38.     In September 2020, Barton was promoted to a Senior Client Service Leader role.

EXHIBIT 1

39.     Finally, because of Barton's significant contributions over the course of his employment with CDM Smith, Barton was nominated and selected for the opportunity to participate in employee ownership of CDM Smith. Specifically, in or around May 2019. Barton was appointed as a Principal. In or around May 2020, Barton was appointed as an Associate. And finally, in May 2023, Barton was appointed to be a Vice President. With each level came an increase in ownership opportunity.

40.     Separately, because of Barton's value to the business, over the course of his employment with CDM Smith, Barton was offered numerous retention bonuses, including in the form of company stock issuance. Barton was also awarded discretionary gifts of company stock by CDM Smith, at no cost to him, on more than one occasion as recognition for his excellent work.

41.     Indeed, because of Barton's contributions to CDM Smith over the years, he was selected by CDM Smith to participate in the 2020 Leadership Academy - Inspire Track ("Inspire 2020") (also referred to as the Inspire Leadership Academy), a nomination-only 12-month internal talent development and promotion program that recognizes outstanding contributors and provides events focused on providing formal learning, individual development plans, and feedback and mentoring.  Inspire 2020 was a valuable tool for CDM Smith identifying and developing future leaders, and cost the company approximately $1,000,000 (including direct and indirect costs). Consistent with CDM Smith practice and procedure, as a condition for participation in Inspire 2020, Barton was required to execute the Non-Disclosure Agreement, which provides, in relevant part:

- <u>Protection of Confidential Information and Trade Secrets</u>.   During the term of [Barton's] employment with the Company and following the date of termination, for any reason, of [Barton's] employment with the Company, [Barton] will hold in the strictest confidence and will not, directly or indirectly, in whole or in part, use, disclose, copy or remove any of the Company's Confidential Information (defined below), except as such use, disclosure, copying or removal may be required in connection with [Barton's] work for the

EXHIBIT 1

Company, or unless an officer of the Company expressly authorizes such use, disclosure, copying or removal in writing. The duration of [Barton's] obligations are (i) with respect to any Trade Secret (defined below), until such Trade Secret is no longer considered a trade secret under applicable state law, or (ii) with respect to any Confidential Information that is not a trade secret, for a period of three (3) years, unless the Confidential Information has been made available generally to the public either by the Company or by a third party with the consent of the Company. In addition, [Barton] will not use, disclose, copy or remove, or facilitate the use, disclosure, copying or removal of any Confidential Information or Trade Secret in a manner or for a purpose which is: (a) in violation of the Company's policies or procedures; (b) otherwise inconsistent with the Company's measures to protect its interests in the Confidential Information or Trade Secret; (c) in violation of any lawful instruction or directive, either written or oral, of a Company employee authorized to issue such instruction or directive; (d) in violation of any duty [Barton has] existing under law; or (e) otherwise to the detriment of the Company.

- Protection of Third Party Information. [Barton] understand[s] that the Company from time to time may receive from third parties, such as customers, suppliers, and vendors, confidential or proprietary information or trade secrets (collectively, "Third Party Information") subject to a duty on the Company to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of [Barton's] employment with the Company and following the date of termination, for any reason, of my employment with the Company, [Barton] will hold any such Third Party Information in the strictest confidence and will not disclose to anyone (other than the Company personnel who need to know such information in connection with their work for the Company) or use, except in connection with [Barton's] work for the Company, Third Party Information unless expressly authorized by an officer of the Company in writing. The duration of [Barton's] obligations are (a) with respect to any such trade secrets, until such trade secrets are no longer considered trade secrets under applicable state law, and (b) with respect to any confidential Third Party Information that is not a trade secret, for a period of three (3) years, unless the confidential Third Party Information has been made available generally to the public either by the Company or by a third party with the consent of the Company. In the event [Barton is] requested or ordered by a court of competent jurisdiction to disclose Confidential Information or Trade Secrets of the Company or Third Party Information, [Barton] agree[s] to provide the Company with immediate notice of such request or order, provided that the giving of such notice will not violate the order and, at the Company's request and expense, resist such request or order to the fullest extent permitted by law.

(*See* Exhibit E, July 24, 2020 Non-Disclosure Agreement, §§ 2-3.)

42.     The Non-Disclosure Agreement defines "Confidential Information" to mean:

any and all confidential and/or proprietary knowledge, data or information owned, developed or possessed by the Company whether in tangible or intangible form. Confidential Information includes, but is not limited to: (a) information relating to the Company's methods, products and services, pricing, customer identities, customer needs,

# EXHIBIT 1

suppliers, processes, know-how, specifications, designs, drawings, concepts, compositions, ideas, techniques, developmental work, research and development, and improvements; (b) information relating to plans for business development, research and development, new methods and services, marketing and selling, sales forecasts, business plans, budgets and unpublished financial statements, licenses, prices and costs, planned acquisitions and divestitures, and planned purchases; and (c) information regarding the skills and compensation of employees of the Company, personnel and policy manuals, and contracts with employees, customers, suppliers, consultants, business partners and others. The term "Confidential Information" does not include information, knowledge or data which I can prove was in my possession before the commencement of my employment with the Company or information, knowledge or data that was or is in the public domain by reason other than any wrongful act.

(*See* Ex. B, § 2.)

43. The Non-Disclosure Agreement further defines "Trade Secret" as "all trade secrets as defined under applicable federal and/or state law." (*See id.*)

44. The Non-Disclosure Agreement also contained an "No Solicitation of Employees and Consultants" (See id., § 4) provision whereby Barton agreed that for a period of 1 year following his separation of employment that he would not "solicit recruit, hire, induce or encourage" an employee or independent contractor "to leave the employee of the Company" which further calls into question Barton's downloading documents related to CDM Smith personnel, including employee resumes and portfolios of work as well as documents containing CDM Smith employee compensation data.

45. The Non-Disclosure Agreement, like the Confidentiality Agreement, is governed by Massachusetts law. (*See id.*, § 7.)

46. As consideration for his execution of the Non-Disclosure Agreement, Barton was selected and participated in Inspire 2020 and further, was promoted from a Client Service Leader to a Senior Client Service Leader.

47. At all times, Barton served in a client-facing role, with significant interaction with CDM Smith clients and prospects, and, particularly in the latter stages of his CDM Smith career,

EXHIBIT 1

was heavily involved in pricing projects, budgeting projects, identifying employees to serve on project teams, identifying and leveraging client preferences, and management of a project from origination to ultimate delivery.

48.     In his final three years of employment with CDM Smith, Barton originated, or was otherwise involved in originating, client projects totaling approximately $96 million in revenue for CDM Smith. He was the client relationship owner for several municipalities, counties, and public utilities companies across the state of North Carolina.

49.     Additionally, Barton was highly involved in the development of new projects to existing clients and/or procuring new clients, and, at or near the end of his CDM Smith employment, was actively involved in projects or proposals that, if secured, would have originated approximately $60 million in additional revenue over the next 18 months.

50.     Throughout his employment, Barton was required to complete internal training sessions regarding his role and responsibilities including, but not limited to, his obligations with respect to data security and confidential information.  Like all CDM Smith employees, Barton was required to complete annual training on ethics and CDM Smith's core values, which covered, among other topics, CDM Smith employees' obligations regarding data security and accessing and properly maintaining confidential company information.

51.     Barton was also highly-compensated.  He received significant annual compensation increases in each year of employment, and for each of the final three (3) years of his employment, was paid in excess of $200,000 per year in base compensation.

EXHIBIT 1

***Barton's Misappropriation of CDM Smith's Confidential Information and Trade Secret Information***

52. Upon information and belief, Barton first spoke with Garver about potential employment in the summer of 2025, and received an offer for employment from Garver on or about February 4, 2026, that required Barton's acceptance of the offer the same day.

53. Upon information and belief, Barton accepted Garver's job offer on or about February 4, 2026.

54. Despite the foregoing, Barton did not inform CDM Smith of his acceptance of Garver's job offer for months, and did not submit his notice of resignation until April 28, 2026. Barton's resignation notice proposed a final work date of May 6, 2026.

55. Upon information and belief, Barton delayed informing CDM Smith of his acceptance of a competitor's job offer to allow for time for him to exfiltrate confidential and proprietary information and obtain a SPARS bonus issued in March 2026.

56. On April 29, 2026, CDM Smith accepted Barton's resignation.

57. On or about April 30, 2026, CDM Smith Senior Vice President and Southwest Group Sales Leader David Collins informed Barton that CDM Smith accepted his resignation, and that Barton would be paid through May 6, 2026. Finally, during the meeting, Mr. Collins required Barton to return his company-issued devices, including the Company Computer and company-issued iPhone.

58. On May 1, 2026, Elizabeth Sartor, Senior Manager, Human Resources Business Partner, met with Barton to review, among other things, his obligations to the company, including his obligations regarding company confidential information, proprietary information, and trade secrets information, including, but not limited to, as specified in the Confidentiality Agreement and the Non-Disclosure Agreement

EXHIBIT 1

59. Unbeknownst to CDM Smith, over the course of approximately three days surrounding Barton's submission of his resignation notice on April 28, 2026, Barton, using his Company Computer, downloaded, copied, or otherwise transferred, on information and belief, more tens of thousands of individual files belonging to CDM Smith and/or CDM Smith's wholly-owned subsidiary, CDM Constructors Inc., to an external hard drive, without authorization by CDM Smith. Barton's exfiltration activity was discovered after CDM Smith's Business Technology ("BT") personnel reviewed the activity logs for Barton's Company Computer on the Company Server. A summary of the categories and types of files Barton downloaded or otherwise transferred is as follows:

    a. Resumes and portfolio materials for CDM Smith employees;

    b. Project experience and technical project files, which include engineering project reports, design documents, studies, and planning files;

    c. CDM Smith-internal templates and project management resources, including corporate and project templates, safety plans, calculation sheets, tracking logs;

    d. Public notification and stakeholder communication files, which include public notification plans, stakeholder presentation materials, letters, and project meeting notes;

    e. Contract templates, rate schedules, proposals, pricing tools and client and/or project contracts;

    f. Presentations and meeting materials, including CDM Smith-internal briefing documents, and;

    g. Financial, audit, and tracking data, including budget tracking spreadsheets, financial analysis files, and audit logs.

EXHIBIT 1

(*See* Livermore Decl., ¶¶ 9-10.)

60.     On or about May 6, 2026, CDM Smith, through undersigned counsel, served Barton with a cease and desist letter, reminding Barton of his obligations to CDM Smith, including with respect to CDM Smith confidential and/or proprietary information, instructing him to return the files he improperly retained, and instructing him to cease and desist all further violations of his contractual and legal obligations. (*See* Exhibit A)

61.     On or about May 9, 2026, CDM Smith, through undersigned counsel, sent a letter to Garver's Chief Legal Officer / General Counsel and Senior Vice President, John Kurtis, informing Garver of Barton's legal and contractual obligations to CDM Smith and advising Garver that CDM Smith has reason to believe Barton unlawfully retained CDM Smith confidential and/or trade secret information. (*See* Exhibit B)

62.     Following his voluntary resignation, CDM Smith reminded Barton in writing of his legal and contractual obligations owed to CDM Smith, and requested that Barton return his personal hard drive, on which he transferred CDM Smith's files, and execute a declaration confirming he was not in possession of any CDM Smith property, including confidential information.  Although Barton returned a hard drive, which CDM Smith is currently analyzing with the assistance of a forensics vendor, Barton has refused to execute the declaration.  Therefore, upon information and belief, CDM Smith concerns remain that Barton retains possession of some or all of the tens of thousands of documents he improperly transferred as well as other CDM Smith property, including additional confidential information and trade secrets.

EXHIBIT 1

**CLAIMS FOR RELIEF**

**COUNT I**
**BREACH OF CONTRACT**
(Confidentiality Agreement)

63.     CDM Smith realleges and incorporates by reference each and every allegation in the preceding paragraphs.

64.     Barton entered into a valid and enforceable agreement which contained a confidentiality restrictive covenant, as set forth in the Confidentiality Clauses of the Confidentiality Agreement.

65.     Barton agreed that he would not communicate nor disclose to any party outside of CDM Smith, or use for any purpose other than to conduct CDM Smith business, any of CDM Smith's confidential information or confidential materials.

66.     Barton downloaded, copied, or otherwise transferred thousands of CDM Smith files to a personal hard drive.

67.     Barton was not authorized to transfer these files to his personal hard drive.

68.      While Barton has returned a hard drive which CDM Smith is in the process of having analyzed by a third-party forensic examiner, based on Barton's refusal to date to provide a declaration confirming that has returned all of CDM Smith property, including its confidential information and trades secrets, CDM Smith,  upon information and belief, believes Barton remains in possession of CDM Smith property, including its confidential information.

69.     Barton's actions violate the Confidentiality Agreement.

70.     As a result of such breach, CDM Smith has been and/or will be severely damaged.

EXHIBIT 1

## COUNT II
## BREACH OF CONTRACT
(Non-Disclosure Agreement)

71.     CDM Smith realleges and incorporates by reference each and every allegation in the preceding paragraphs.

72.     Barton entered into a second valid and enforceable agreement which contained a confidentiality restrictive covenant, as set forth in the Confidentiality Clauses of the Non-Disclosure Agreement.

73.     Barton agreed that he would not use, disclose, copy or remove any of the Company's Confidential Information or Trade Secrets, or Third Party Information, as those terms are defined in the Non-Disclosure Agreement.

74.     Barton downloaded, copied, or otherwise transferred thousands of CDM Smith files, including files containing Third Party Information related to CDM Smith clients, to a personal hard drive.

75.     Barton was not authorized to transfer these files to his personal hard drive.

76.     While Barton has returned a hard drive which CDM Smith is in the process of having analyzed by a third-party forensic examiner, based on Barton's refusal to date to provide a declaration confirming that has returned all of CDM Smith property, including its confidential information and trades secrets, CDM Smith, upon information and belief, believes Barton remains in possession of CDM Smith property, including its confidential information.

77.     Barton's actions violate the Non-Disclosure Agreement.

78.     As a result of such breach, CDM Smith has been and/or will be severely damaged

21

EXHIBIT 1

## COUNT III
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

79. CDM Smith realleges and incorporates by reference each and every allegation in the preceding paragraphs.

80. Barton's actions including, but not limited to, taking CDM Smith's property, including its confidential information, when he was not authorized to do so, in violation of the Confidentiality Agreement and/or the Non-Disclosure Agreement, constitute actions in bad faith and breached the implied covenant of good faith and fair dealing.

81. As a result of such breach, CDM Smith has been and/or will be severely damaged.

## COUNT IV
## COMPUTER TRESPASS

82. CDM Smith realleges and incorporates by reference each and every allegation in the preceding paragraphs.

83. Barton used computers and computer networks belonging to CDM Smith in a manner exceeding his permission to use those computers and networks, including, but not limited to, Barton's transfer of CDM Smith files, including files constituting or containing CDM Smith confidential information, to a personal external hard drive.

84. CDM Smith did not give Barton permission to access its computers or computer networks to transfer to himself for personal use its confidential information.

85. Barton's violation of N.C. Gen. Stat. §§ 14-458(a)(1), (3), and (5) caused CDM Smith damage, including but not limited to, the costs of pursuing this action.

## COUNT V
## TRADE SECRET MISAPPROPRIATION UNDER THE DEFEND TRADE SECRETS ACT

86. CDM Smith realleges and incorporates by reference each and every allegation in the preceding paragraphs.

22

EXHIBIT 1

87.    CDM Smith owns and possesses trade secret information as set forth above, including documents containing confidential and proprietary information that is valuable specifically because it is not known to the public.

88.    CDM Smith is aware of at least the following categories of trade secret information misappropriated by Barton:

a.    Project experience and technical project files, which include engineering project reports, design documents, studies, and planning files;

b.    CDM Smith-internal templates and project management resources, including corporate and project templates, safety plans, calculation sheets, tracking logs;

c.    Public notification and stakeholder communication files, which include public notification plans, stakeholder presentation materials, letters, and project meeting notes;

d.    Contract templates, rate schedules, proposals, pricing tools and client and/or project contracts;

e.    Presentations and meeting materials, including CDM Smith-internal briefing documents, and;

f.    Financial, audit, and tracking data, including budget tracking spreadsheets, financial analysis files, and audit logs.

89.    These trade secrets were developed by CDM Smith at significant expense and nurtured over the course of many years.

90.    CDM Smith's trade secret information is highly valuable, and CDM Smith will suffer irreparable harm from the use and disclosure of its information, including loss of business and loss of competitive advantage.

EXHIBIT 1

91. CDM Smith has taken reasonable steps to protect the secrecy of its trade secrets, including those listed in Paragraph 59 above.

92. Barton misappropriated CDM Smith's trade secret information by downloading or otherwise transferring files to a personal hard drive in preparation for his resignation and departure from CDM Smith and, retaining those files and a CDM Smith device after his employment terminated.

93. Barton had no legitimate business reason to take those documents.

94. Barton's misappropriation of CDM Smith's trade secret information has caused and will continue to cause CDM Smith substantial injury, including but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its trade secrets.

95. Upon information and belief, Barton has also been unjustly enriched by his misappropriation of CDM Smith's trade secrets which, as described above, are worth millions of dollars.

96. Barton's misappropriation of CDM Smith's trade secrets was willful and malicious within the meaning of 18 U.S.C. Section 1836(b)(3)(C). Barton's misappropriated CDM Smith's trade secrets intentionally and knowingly and with a deliberate intent to benefit himself and to injure CDM Smith, against whom he is now competing.

97. CDM Smith is entitled to damages in an amount to be determined at trial, as well as an award of exemplary damages and attorney fees pursuant to 18 U.S.C. Section 1836(b)(3).

**COUNT VI**
**VIOLATION OF THE NORTH CAROLINA TRADE SECRETS PROTECTION ACT**

98. CDM Smith realleges and incorporates by reference each and every allegation in the preceding paragraphs.

99. During his employment with CDM Smith, Barton had access to, reviewed and used

EXHIBIT 1

certain trade secrets and confidential information of CDM Smith. This information is economically valuable, is not generally known to the public, and CDM Smith has expended substantial time, money, and effort in developing such information for business use and to obtain a competitive advantage.

100. As set forth above, CDM Smith took reasonable efforts to maintain the secrecy of this information.

101. Accordingly, the various items of information described above, including but not limited to, the files described in Paragraph 47, constitute trade secrets within the meaning of the North Carolina Trade Secrets Protection Act ("The Trade Secrets Act"), N.C. Gen. Stat. § 66-152 et seq.

102. Defendant Barton's misappropriation of CDM Smith's trade secret information has caused and will continue to cause CDM Smith substantial injury, including but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its trade secrets.

103. Barton's misappropriation of CDM Smith's trade secrets was willful and malicious within the meaning of N.C. Gen. Stat. § 66-1528 (b). Barton misappropriated CDM Smith's trade secrets intentionally and knowingly and with a deliberate intent to benefit himself and to injure CDM Smith, against whom he is now competing.

104. CDM Smith is entitled to damages in an amount to be determined at trial, as well as an award of punitive damages exemplary damages and attorney fees pursuant to N.C. Gen. Stat. § 66-152(a) – (d).

**COUNT VII**
**VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**

105. CDM Smith realleges and incorporates by reference each and every allegation in the preceding paragraphs.

EXHIBIT 1

106. Barton's conduct as described herein constitutes an unfair or deceptive act or practice or an unfair method of competition.

107. Barton's conduct as described herein was in or affecting commerce.

108. Barton's misappropriation of CDM Smith's confidential information constitutes unfair and deceptive acts, and unfair methods of competition, all of which affected CDM Smith's business.

109. Barton's actions as described herein violated the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1, et seq.

110. CDM Smith is entitled to pre- and post-judgment interest against Defendant for actual damages trebled pursuant to the Act, attorneys' fees, injunctive relief and such other relief the Court deems just and proper.

## COUNT VIII
## CONVERSION

111. CDM Smith realleges and incorporates by reference each and every allegation in the preceding paragraphs.

112. CDM Smith is the lawful owner of the confidential information that Barton transferred to himself.

113. By the actions described above, Barton exercised a right of ownership over CDM Smith's confidential information that he emailed to himself and without authorization to do so and, in so doing, deprived CDM Smith of the further exclusive use of that confidential information to the exclusion of its property rights over them.

114. Barton's conduct was malicious, willful and wanton such that punitive damages should be awarded under N.C. Gen. Stat. § 1D-15.

EXHIBIT 1

## **PRAYER FOR RELEF**

WHEREFORE, CDM Smith prays the Court will grant judgment in its favor against Barton, as follows:

1. For compensatory damages, according to proof;

2. For exemplary, treble and punitive damages, according to proof;

3. For restitution and/or disgorgement of profits;

4. For attorney fees;

5. For costs of suit incurred herein;

6. For pre- and post-judgment interest as provided by law;

7. For a trial by jury, and;

8. For such other and further relief as the Court may deem proper.

## **JURY DEMAND**

Plaintiff respectfully demands a trial by jury for all causes of action so triable.

Dated: May 15, 2026

*/s/Stephen D. Dellinger*
Kevin Cleys, Bar No. 51589
kcleys@littler.com
Stephen D. Dellinger, Bar No. 16609
sdellinger@littler.com

LITTLER MENDELSON, P.C.
620 South Tryon Street
Suite 950
Charlotte, NC 28202
Telephone: 704.972.7000
Facsimile: 704.333.4005

Attorneys for Plaintiff

EXHIBIT 1

NC STATE OF NORTH CAROLINA
COUNTY OF WAKE

IN THE GENERAL COURT OF
JUSTICE
SUPERIOR COURT DIVISION
CASE NO.

CDM Smith Inc.,

       Plaintiff,

  vs.

Reed Barton

       Defendant.

**COMPLAINT VERIFICATION**

I, David L. Collins, hereby verify that I am the Sr. Vice President for CDM Smith Inc. ("CDM Smith"). I have read the foregoing Verified Complaint and know the contents thereof; to the extent the factual statements therein are based on my personal knowledge, I know that they are true and accurate to the best of my knowledge; to the extent that the factual statements therein are based on statements that have been told to me by others or what I have read, I believe them to be true and accurate; and to the extent that the factual statements therein are based on the personal knowledge of other employees or agents of CDM Smith, I believe them to be true and accurate.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

EXHIBIT 1

Signed under the pains and penalties of perjury this _15_ day of May, 2026.

David L. Collins

Sworn to and subscribed before me this
the _15_ day of May, 2026.

Notary Public

Nicole B. Sanford
Printed Name



My commission expires:_ May 21 2029 _

2